(315 P.3d 896)
No. 108,426

MARY CLAWSON, Trustee, and CLAWSON LAND PARTNERSHIP, *Appellees/Cross-appellants,* v. STATE OF KANSAS, DEPARTMENT OF AGRICULTURE, DIVISION OF WATER RESOURCES, *Appellant/ Cross-appellee.*

790

Opinion filed December 20, 2013.

*Burke W. Griggs*, of Division of Water Resources, Kansas Department of Agriculture, for appellant/cross-appellee.

*David M. Traster*, of Foulston Siefkin LLP, of Wichita, for appellees/cross-appellants.

*Aaron Popelka* and *Myndee M. Reed*, for *amicus curiae* The Kansas Livestock Association.

Before LEBEN, P.J., McANANY and POWELL, JJ.

POWELL, J.: In this appeal, we are called upon to answer the question of what limits exist on the exercise of state agency power by the chief engineer of the Kansas Department of Agriculture's Division of Water Resources (DWR) when the regulated activity involves a precious and increasingly scarce resource—water. Mary Clawson and the Clawson Land Partnership (Clawson) obtained 10 approvals and permits from the chief engineer of the DWR to appropriate water. Under the terms and conditions of the water appropriation permits, the chief engineer imposed a specific monitoring plan and retained jurisdiction to reduce the approved rates of diversion and the quantities of the water rights authorized to be perfected as may be deemed in the public interest. After exhausting administrative remedies, Clawson challenged these terms and conditions in the district court of Meade County. The district court upheld the requirements of the specified monitoring plan but found the chief engineer could not retain jurisdiction to reduce the

rates of diversion and the quantities of the water rights authorized to be perfected after the issuance of the permits.

The DWR appeals the district court's finding that the chief engineer cannot retain jurisdiction to make reductions in the approved rates of diversion and the quantities of the water rights authorized to be perfected. Clawson cross-appeals, contending the monitoring plan, which requires Clawson to install electronic rate loggers, is unduly burdensome and oppressive. We agree with the district court that the chief engineer cannot retain jurisdiction once the Kansas Department of Agriculture issues a final order and that the chief engineer's monitoring plan is within his statutory authority, but we also find that there is insufficient evidence in the record to determine whether the monitoring plan is unreasonable; therefore, we affirm in part, reverse in part, and remand with instructions.

### FACTUAL AND PROCEDURAL HISTORY

On September 20, 2002, Clawson applied to the DWR's chief engineer for two new appropriations of groundwater in Meade County, which were assigned file Nos. 45-250 and 45-251. On January 14, 2003, Clawson applied to the chief engineer for eight new appropriations of groundwater in Meade County, which were assigned file Nos. 45-403, 45-404, 45-405, 45-406, 45-407, 45-408, 45-409, and 45-410. While Kansas law requires a decision on applications within 150 days, nearly 1 1/2 years passed before all 10 applications were dismissed by the chief engineer on May 26, 2004. The chief engineer concluded that the additional water permits would impair existing water rights. Clawson requested a hearing on the dismissals, over which Chief Engineer David Pope presided in August 2005.

Nearly 2 years passed after the hearing without a decision. Pope then retired on June 16, 2007. David Barfield succeeded Pope as the DWR's chief engineer and assumed the role of hearing officer. After another roughly 2-year wait, on May 8, 2009, Barfield finally issued an order reopening the Clawson record because there was not enough information to determine whether the pumping of groundwater would impair senior water right holders.

On May 26, 2009, Clawson filed a motion seeking reconsideration or administrative review of Barfield's order by the Secretary of Agriculture. The Secretary granted administrative review on June 9, 2009. The parties submitted briefs, and on July 10, 2009, the Secretary issued an order directing the chief engineer "to approve the applications and issue the permits within sixty (60) days in accordance with applicable statutes and regulations."

Thereafter, on August 27, 2009, the chief engineer issued Clawson's 10 permits with the following terms, conditions, and limitations:

- The chief engineer imposed a monitoring plan requiring electronic rate loggers that record the pumping rate every 30 minutes throughout the irrigation season. The chief engineer also reserved authority to review, modify, and expand the required monitoring plan as necessary and to impose additional conditions, including reductions in the authorized rate and quantity, or suspension of the authority to divert water.
- The chief engineer reduced the amount of acre-feet that Clawson requested in the application from 2.0 to 1.8 acre-feet.
- The chief engineer retained jurisdiction "to make reasonable reductions in the approved rate of diversion and quantity authorized to be perfected, and such changes in other terms, conditions, and limitations set forth in this approval as may be deemed to be in the public interest."

On September 11, 2009, Clawson requested an administrative review or hearing before the chief engineer, which the Secretary denied on September 29, 2009. Following the denial, Clawson filed a petition for judicial review on October 28, 2009, in the District Court of Meade County. Clawson challenged the quantity of water allowed under the permits, the monitoring plan, and the chief engineer's retention of jurisdiction.

On November 22, 2011, the district court held a hearing on Clawson's petition for judicial review. On January 9, 2012, the district court issued its memorandum decision which found the agency action valid in all aspects, including the monitoring plan, but found the chief engineer could not retain jurisdiction.

On February 6, 2012, Clawson filed a motion to alter or amend, alleging the district court failed to address "[w]hether unlawful impairment occurs when a junior groundwater right impacts a hydraulically connected senior surface water right, but the impact is not beyond a reasonable economic limit as required by K.S.A. 82a-711 and 82a-711a." On March 16, 2012, the DWR filed a response to the motion to alter or amend. Clawson filed a reply.

On May 21, 2012, the district court issued an order that agreed with Clawson: "[N]o lawful impairment occurs unless a junior groundwater right impacts a senior water right beyond a reasonable economic limit," but it found the question of whether "the impact on senior water rights is not beyond a reasonable economic limit [was] not ripe for decision."

On February 13, 2012, the DWR filed a timely notice of appeal of the January 9, 2012, order. Later, on June 11, 2012, its notice of appeal was amended to include the May 21, 2012, order. On June 11, 2012, Clawson filed a cross-appeal of the orders entered on January 9, 2012, and May 21, 2012.

On July 22, 2013, The Kansas Livestock Association (KLA) filed an *amicus curiae* brief.

ANALYSIS

*Standard of Review*

Under K.S.A. 2012 Supp. 82a-724, final orders of the DWR are reviewed under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.* See *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 907, 249 P.3d 434 (2011). Pursuant to K.S.A. 2012 Supp. 77-621(c), a court reviewing an administrative action shall grant relief only if it determines that the agency violated one or more of the provisions listed in K.S.A. 2012 Supp. 77-621(c)(1)-(8). "On appeal, we exercise the same statutorily limited review of the agency's action as does the district court, *i.e.*, ' "as though the appeal had been made directly to this court." ' [Citation omitted.] The party asserting the agency's action is invalid bears the burden of proving the invalidity." *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 611, 132 P.3d 870 (2006) (quoting *Blue Cross & Blue Shield of*

*Kansas, Inc. v. Praeger*, 276 Kan. 232, 245, 75 P.3d 226 [2003]); see K.S.A. 2012 Supp. 77-621(a)(1).

With regard to questions of law, traditionally Kansas courts have given deference to an agency's interpretation of a statute if there was a rational basis for it. *Fieser v. Kansas Bd. of Healing Arts*, 281 Kan. 268, 270, 130 P.3d 555 (2006). However, in *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, 457, 228 P.3d 403 (2010), our Supreme Court declared that an agency's statutory interpretation "is not afforded any significant deference on judicial review." Therefore, " '[w]hether an agency has exceeded its statutory authority requires interpretation of the statutes establishing the agency.' " *Ryser v. State*, 295 Kan. 452, 464, 284 P.3d 337 (2012). In this case, the agency's statutory authority is governed by the Kansas Water Appropriation Act (KWAA), K.S.A. 82a-701 *et seq.* Specifically, this case involves interpretation of K.S.A. 2012 Supp. 82a-711(a) and K.S.A. 82a-706c. This court interprets the KWAA de novo just as it does all other statutes. See 295 Kan. at 457.

Accordingly,

"[w]e first attempt to ascertain legislative intent by reading the plain language of the statutes and giving common words their ordinary meanings. [Citation omitted.] When a statute is plain and unambiguous, we do not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. But when the statute's language or text is unclear or ambiguous, we 'employ canons of construction, legislative history, or other background considerations to divine the legislature's intent and construe the statute accordingly.' [Citations omitted.]" 295 Kan. at 458.

As to an agency's factual findings, K.S.A. 2012 Supp. 77-621(c)(7) has always provided that appellate courts review an agency's factual findings to ensure substantial evidence supports them "in light of the record as a whole." However, Kansas caselaw limited this review by directing courts to look at the evidence in the light most favorable to the agency's ruling. If the court found substantial evidence that would support the agency's decisions, it was not to be concerned about other evidence that might have led to a different result. See *Graham v. Dokter Trucking Group*, 284

Kan. 547, 553-54, 161 P.3d 695 (2007); *Gutierrez v. Dold Foods, Inc.*, 40 Kan. App. 2d 1135, Syl. ¶ 4, 199 P.3d 798 (2009).

The KJRA was amended significantly in 2009. The savings clause of K.S.A. 77-621(a)(2) prevented retroactive application of the 2009 amendments. Thus, the amendments apply only to cases in which the agency action at issue occurred on or after July 1, 2009. See *Redd v. Kansas Truck Center*, 291 Kan. 176, 182, 239 P.3d 66 (2010); K.S.A. 2012 Supp. 77-621(a)(2). The amendments apply in this case because the agency action at issue—the issuance of the water permits—occurred on August 27, 2009.

As amended, K.S.A. 2012 Supp. 77-621(d) now defines "in light of the record as a whole" to include evidence that both supports and detracts from an agency's finding. Thus, appellate courts must determine whether the evidence supporting the agency's factual findings is substantial when considered in light of all the evidence. Substantial evidence is such evidence as a reasonable person might accept as being sufficient to support a conclusion. *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 362-63, 212 P.3d 239 (2009).

## Background on Kansas Water Law

Before analyzing the statute and the parties' arguments, we think it helpful to give some background on Kansas water law.

"This country has followed two essentially different water law doctrines: The common law or riparian doctrine and the appropriation doctrine. The common law concept originated in areas with abundant water while the appropriation doctrine developed in semi-arid areas.

. . . .

"The appropriation doctrine is based upon the premises that all unused water belongs to all of the people of the state. The first person to divert water from any source and use it for beneficial purposes has prior right thereto. In other words, first in time, first in right. This doctrine is said to reward development by giving the early appropriator the fruits of his industry. The rule gives greater certainty of rights while affording a more flexible administration of the law and encourages free enterprise by protecting a developer's investment. It discourages waste of a valuable resource and distributes the resource in response to demonstrated need.

"Although Kansas adopted common-law rules relating to water rights when it became a territory and later a state, the legislature sanctioned appropriation rights before the turn of the century. [Citation omitted.] It was not until 1945 that Kansas

adopted the Water Appropriation Act of Kansas and provided an effective procedure for acquiring water appropriation rights. [Citation omitted.]" *F. Arthur Stone & Sons v. Gibson*, 230 Kan. 224, 228-30, 630 P.2d 1164 (1981).

The KWAA grants the chief engineer of the DWR the authority to "enforce and administer the laws of this state pertaining to the beneficial use of water and [the chief engineer] shall control, conserve, regulate, allot and aid in the distribution of the water resources of the state for the benefits and beneficial uses of all of its inhabitants in accordance with the rights of priority of appropriation." K.S.A. 82a-706. Therefore, a person seeking to appropriate water, other than for domestic use, must file an application with the chief engineer. See K.S.A. 2012 Supp. 82a-705, K.S.A. 2012 Supp. 82a-708a, K.S.A. 2012 Supp. 82a-709. The KWAA further provides that an application made in good faith and in proper form must be approved by the chief engineer, provided the application does not impair an existing water right or prejudicially and unreasonably affect the public interest. K.S.A. 2012 Supp. 82a-711.

Once perfected, "[w]ater rights are considered real property." *Cochran*, 291 Kan. at 902; see K.S.A. 2012 Supp. 82a-701(g). However, " 'a water right does not constitute ownership of the water itself; it is only a usufruct, a right to use water.' " 291 Kan. at 902 (quoting *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, Syl. ¶ 6, 210 P.3d 105 [2009]); see K.S.A. 2012 Supp. 82a-707(a). Moreover, the water right remains subject to the principle of beneficial use. *Hawley*, 281 Kan. at 614. Other than for domestic use, the KWAA eliminated the notion that a landowner had absolute title to water in contiguous streams or underground; it based water rights upon the time of use and the actual application of water for beneficial use. No longer could a landowner simply own water without using it. Adequate administrative controls also ensured the public interest was protected by preventing overdevelopment. *Stone*, 230 Kan. at 232; *Williams v. City of Wichita*, 190 Kan. 317, 334, 374 P.2d 578 (1962). This doctrine of water appropriation "has become a rule of property law relied upon by the entire state." *Stone*, 230 Kan. at 233. The doctrine has provided stability for landowners, water right holders, and the public. The

importance of stability in property law has been recognized by our Supreme Court:

" 'In a well-ordered society it is important that people know what their legal rights are, not only under constitutions and legislative enactments, but also as defined by judicial precedent, and having conducted their affairs in reliance thereon, ought not to have their rights swept away by judicial decree. And this is especially so where rights of property are involved. . . . And it should be left to the legislature to make any change in the law, except perhaps in a most unusual exigency.' " 230 Kan. at 233 (quoting *Freeman v. Stewart*, 2 Utah 2d 319, 322, 273 P.2d 174 [1954]).

It is with this background in mind that we proceed to the two main questions before us.

## DOES THE CHIEF ENGINEER HAVE AUTHORITY TO RETAIN JURISDICTION TO REDUCE THE APPROVED RATE OF DIVERSION OR THE QUANTITY OF THE WATER RIGHTS AUTHORIZED TO BE PERFECTED AFTER THE ISSUANCE OF A WATER APPROPRIATION PERMIT?

The first question we must answer is whether the chief engineer, upon issuing a water appropriation permit and after the Secretary of Agriculture has approved the permit through the issuance of a final order, has the authority to retain jurisdiction to make reasonable reductions in the approved rate and quantity of water to be diverted and to make other changes to the approved water appropriation that are deemed to be in the public interest. The chief engineer included the following language in the water permits issued to Clawson:

"25. That the Chief Engineer specifically retains jurisdiction in this matter with authority to make such reasonable reductions in the approved rate of diversion and quantity authorized to be perfected, and such changes in other terms, conditions, and limitations set forth in this approval and permit to proceed as may be deemed in the public interest."

On appeal, Clawson and the KLA argue that this language is meaningless. Once the chief engineer issues a permit and the applicant begins perfection of the water right, a cognizable property right is created. Because of the substantial investment required to

perfect water rights and the importance of water rights to their holders, the rights should be determined with finality.

In defense of this language, the DWR argues that is it consistent with the statutory authority given by the KWAA to the chief engineer "to impose conditions and to modify rights as necessary to protect both prior rights and the public interest," citing K.S.A. 82a-706, K.S.A. 82a-706b, K.S.A. 82a-706c, and K.S.A. 82a-712. The DWR divides the language into two clauses: the first dealing with modification of the water to be diverted and the second dealing with modifications to the permit as necessary for the protection of the public interest. The DWR argues that the first clause is limited to the perfection period and is lawfully consistent with the KWAA. It further argues that the second clause is lawful because it is consistent with the KWAA's mandate that the chief engineer protect the public interest.

*Analysis*

It is a well-established rule of law that Kansas administrative agencies have no common-law powers. "Any authority claimed by an agency or board must be conferred in the authorizing statutes either expressly or by clear implication from the express powers granted." *Ft. Hays St. Univ.*, 290 Kan. at 455. Our Supreme Court declared:

"The following is stated in 42 Am. Jur., Public Administrative Law, § 174, pp. 535, 536 and 537:

'[I]t is often held that administrative tribunals, in the absence of statute, have no power to reconsider, grant a rehearing on, or set aside, their final determinations. The power of administrative authorities to reconsider or modify their own determinations may exist by reason of express provision of statute, or its existence may be inferred from a statutory provision. Lacking this, whether the power exists depends upon an interpretation of the entire statute and policy applicable to the particular administrative agency. Administrative determinations are subject to reconsideration and change where they have not passed beyond the control of the administrative authorities, as where the determinations are not final, but interlocutory, or where the powers and jurisdiction of the administrative authorities are continuing in nature . . . .' " *Warburton v. Warkentin*, 185 Kan. 468, 475, 345 P.2d 992 (1959).

Our court has specifically held that where an agency has no specific statutory authority to retain jurisdiction, it has no ability to

reconsider or modify its final orders once the time for seeking judicial review has passed. See *Johnson v. Kansas Dept. of Revenue*, 29 Kan. App. 2d 455, 459, 27 P.3d 943 (2001); see also *In re Petition of City of Shawnee for Annexation of Land*, 236 Kan. 1, 15, 687 P.2d 603 (1984) (administrative board acting in a quasi-judicial capacity loses the jurisdiction to reconsider or change its prior ruling during pendency of the appeal).

The KJRA allows for judicial review of any "final agency action." K.S.A. 77-607. "Final agency action" is defined as "the whole or a part of any agency action other than nonfinal agency action." K.S.A. 77-607(b)(1). An agency's final order is generally considered to be "an action which determines the legal rights and duties of the parties." *Guss v. Fort Hays State Univ.*, 38 Kan. App. 2d 912, 916, 173 P.3d 1159 (2008). A " 'final order' . . . terminates the litigation on the merits and leaves nothing to be done except to enforce the result. [Citation omitted.] In an administrative setting, a final order needs to be more than a mere procedural ruling, and 'finality' should be interpreted in a pragmatic way." *Kansas Energy Group v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 57, 60, 40 P.3d 310, *rev. denied* 274 Kan. 1113 (2002); *Kansas Pipeline Partnership v. Kansas Corporation Comm'n*, 22 Kan. App. 2d 410, 418, 916 P.2d 76, *rev. denied* 260 Kan. 994 (1996). Conversely, a nonfinal agency action is to be considered "preliminary, preparatory, procedural or intermediate with regard to subsequent agency action." K.S.A. 77-607(b)(2). "An order cannot be final if the matter is still under 'active consideration' by the tribunal." *Guss*, 38 Kan. App. 2d at 917 (citing *Bruns v. Kansas State Bd. of Technical Professions*, 19 Kan. App. 2d 83, 85, 864 P.2d 1212 [1993], *aff'd* 225 Kan. 728, 877 P.2d 391 [1994]). "However, the fact that ministerial tasks remain to be done does not establish that the matter is still under active consideration and does not render a final agency decision nonfinal." *Sprint Communications Co. v. Kansas Corporation Comm'n*, 45 Kan. App. 2d 460, 464-65, 249 P.3d 1210 (2011).

In our case, the DWR does not contest that its order granting the water appropriations was a final order—in fact, the order itself states it is a final order. Therefore, we deem the DWR's order as a "final agency action" as provided by the KJRA. However, the

DWR asserts that the chief engineer still retains jurisdiction to modify the water appropriations during the perfection period to protect senior water right holders and to protect the public interest. As the KJRA and Kansas Administrative Procedure Act (KAPA, K.S.A. 77-501 *et seq.*) do not confer continuing jurisdiction upon the chief engineer, we look to the KWAA to see if continuing jurisdiction is granted there. See *Johnson*, 29 Kan. App. 2d at 457 (KJRA does not allow for reconsideration of agency decisions prior to judicial review); K.S.A. 2012 Supp. 82a-1901(b) (provision of KAPA, K.S.A. 77-529, allowing party to seek reconsideration of final order not applicable to KWAA).

As an initial matter, we dispense with any argument that the mere language in the permits grants the chief engineer continuing jurisdiction. Clawson argues that the chief engineer cannot retain jurisdiction by merely declaring it. We agree; the KWAA must grant this jurisdiction to the chief engineer. See *State, ex rel., v. Railway Co.*, 108 Kan. 847, 850-51, 197 Pac. 192 (1921) (administrative agencies do not have power to retain jurisdiction by merely declaring it).

Second, we also reject the notion that the chief engineer retains jurisdiction to modify an order during the water rights perfection period. We view this as more akin to the chief engineer merely enforcing an order consistent with KWAA and nothing more than a ministerial act. See *Guss*, 38 Kan. App. 2d at 917 (ministerial acts remaining do not establish matter as one still under active consideration); *Noonan v. Noonan*, 127 Kan. 287, 289, 273 Pac. 409 (1929) (court has inherent power to enforce its judgment, but power cannot be enlarged by mere recital that jurisdiction is retained).

In *Guss*, a part-time professor sought judicial review of the university's appeals committee decision terminating him. The university attempted to claim that the university president's letter informing the professor of the university's final decision was not a final order because the issue of sick pay had not been resolved. However, our court held that because there was no dispute as to whether the professor was owed sick pay and how much sick leave the professor had accrued, "[t]he fact that there remained to be

done the ministerial tasks of doing the mathematical calculation and issuing a check [did] not establish that the matter was still under active consideration." 38 Kan. App. 2d at 917.

Under the KWAA, approval of an application permits the applicant "to proceed with the construction of the proposed diversion works and to proceed with all steps necessary for the application of the water to the approved and proposed beneficial use and otherwise perfect his or her proposed appropriation." K.S.A. 82a-712. The regulations define "perfect" as

"actions taken by a water user to develop an approval of application into a water right. These actions shall consist of the completion of the diversion works and the actual application of water to the authorized beneficial use in accordance with the terms, conditions, and limitations of the approval of application." K.A.R. 5-1-1(zz).

The chief engineer also sets a time limit in which to perfect the proposed appropriation. K.S.A. 82a-713; K.S.A. 2012 Supp. 82a-714(c)(3).

An applicant may request additional time to perfect a proposed appropriation, but "[f]ailure to request an extension of time to perfect . . . within the time allowed shall limit the water appropriation right to the extent perfected in accordance with the terms, conditions, and limitations set forth in the approval of application." K.A.R. 5-3-7. If the applicant fails to perfect the appropriation within the allotted time, the permit will be dismissed, and the priority date will be forfeited. K.A.R. 5-3-6; K.A.R. 5-8-6(e).

Once an applicant notifies the chief engineer that construction is complete and the water has been applied to the proposed beneficial use, the chief engineer has the statutory duty to inspect to make sure the appropriation has been perfected in conformity with the approved application. K.S.A. 2012 Supp. 82a-714(a). Upon perfection, the quantity of the water rights perfected and the rate of diversion shall not exceed the amount set forth in the permit. The amount perfected is an amount of water "found to have been actually applied to the approved beneficial use." K.A.R. 5-3-8. If the applicant diverts less water than what the permit allows, the applicant will have perfected his water right to the amount actually diverted.

The significance of the perfection period is that any modification of the water right is dependent upon the actions of the applicant, not the chief engineer. The chief engineer's only role is to monitor and inspect to ensure that the appropriation has been perfected in conformity with the approved application. This is akin to enforcement, and, like in *Guss*, the chief engineer's supervisory role strikes us as ministerial in nature. The chief engineer is no longer engaging in active consideration of the water appropriation request but is merely enforcing the conditions of the water permit consistent with the KWAA's provisions on perfection of a water right.

Finally, we address the DWR's claim that the chief engineer retains jurisdiction to protect senior water rights and the public interest. The DWR contends that *Wheatland Electric Cooperative v. Polanksy*, 46 Kan. App. 2d 746, 265 P.3d 1194 (2011), *rev. denied* 297 Kan. 1257 (2013), controls the disposition of this case. Specifically, the DWR argues that *Wheatland* affirmed the chief engineer's authority to impose conditions upon a water right as he or she deems necessary to protect the public interest and to protect existing water rights. Conversely, while Clawson and the KLA recognize that "the Chief Engineer may approve an application for a smaller amount of water than requested and approve an application upon such terms, conditions, and limitations as he or she shall deem necessary for the protection of the public interest," they argue the chief engineer does not have the statutory power to retain jurisdiction to reduce the approved rate of diversion or quantity of the water rights authorized to be perfected. We agree with Clawson and the KLA.

In the *Wheatland* case, Wheatland applied to change its water right, including the type of use—from irrigation to municipal—and the place of use—from Wheatland to Garden City. The chief engineer approved Wheatland's requested changes but reduced the water usage from 840 acre-feet a year to 91 acre-feet a year. Wheatland sought review, but the Secretary of Agriculture declined. Wheatland then petitioned the district court for review. The district court concluded that the chief engineer could limit Wheatland's right when changing the right's use but reversed and remanded to the agency to recalculate the limitation based on the

place of use, not the parcel Wheatland owned. Upon remand, the chief engineer initiated abandonment proceedings and concluded that Wheatland partially abandoned 196 nonirrigable acres. The Secretary of Agriculture again declined to review, so Wheatland once again petitioned the district court for review. The district court concluded that partial abandonment was not permitted by statute but found the chief engineer could limit the water right's usage. Wheatland and the DWR appealed.

On appeal, our court noted that when a change-of-use application has been made, the chief engineer acts upon it using the same statutory provisions as applied to new applications, as such provisions give the chief engineer the authority to approve an application for a smaller amount than requested and to otherwise act in the public interest. 46 Kan. App. 2d at 752-53. The panel reviewed Attorney General Opinion No. 95-92, where "the attorney general concluded that the chief engineer's regulations authorizing the reduction of the amount of water that could be used as a condition to the approval of a change-of-use application were within the chief engineer's statutory authority." 46 Kan. App. 2d at 754. Our court agreed and concluded the chief engineer could limit consumptive use when approving a change-of-use application, 46 Kan. App. 2d at 755, but the KWAA does not allow partial abandonment of water rights. See 46 Kan. App. 2d at 761-63.

While *Wheatland* reaffirms the chief engineer's statutory authority under K.S.A. 82a-712 to impose such terms, conditions, and limitations as he or she shall deem necessary for the protection of the public interest when determining whether an application is appropriate, it does not control the disposition of this case. The issue in *Wheatland* was whether the chief engineer could limit consumptive use of water when considering a change-of-use application, not whether the chief engineer has statutory authority to retain jurisdiction to limit or reduce water rights on a subsequent date. See also *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 607, 132 P.3d 870 (2003) (chief engineer initiated new proceedings to declare water rights abandoned by serving holder of water rights and issuing notice of hearing); *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 216 P.3d 170 (2009)

(new proceedings initiated to declare water right abandoned by providing notice of hearing to water right holder); K.S.A. 2012 Supp. 82a-718(a) (declaration of abandonment of water right requires chief engineer to serve notice of hearing upon user at least 30 days prior to hearing).

The view that the chief engineer does not retain jurisdiction is bolstered by the language found in K.S.A. 2012 Supp. 82a-1901(b), which states that final orders of the DWR are not subject to reconsideration, and by the factors the chief engineer must take into account when considering whether to grant a water appropriation permit under K.S.A. 2012 Supp. 82a-711(b), which states:

"(b)   In ascertaining whether a proposed use will prejudicially and unreasonably affect the public interest, the chief engineer shall take into consideration:
(1)   Established minimum desirable streamflow requirements;
(2)   the area, safe yield and recharge rate of the appropriate water supply;
(3)   the priority of existing claims of all persons to use the water of the appropriate water supply;
(4)   the amount of each claim to use water from the appropriate water supply; and
(5)   all other matters pertaining to such question."

The statute specifically requires the chief engineer to consider senior water rights and the public interest *prior* to granting a water right. In fact, once the chief engineer finds that "a proposed use neither impairs a use under an existing water right nor prejudicially and unreasonably affects the public interest, the chief engineer *shall* approve all applications for such use made in good faith . . . ." (Emphasis added.) K.S.A. 2012 Supp. 82a-711(a).

Parenthetically, we surmise the genesis of the chief engineer's desire to retain jurisdiction over Clawson's water permits is the chief engineer's disagreement with the Secretary of Agriculture's order directing him to approve the water appropriation applications in the first instance. When the chief engineer approved Clawson's applications for water appropriation rights, he stated:

"According to the [Secretary's] Order, [K.S.A. 82a-711(a)] requires DWR to approve the application if there is not a finding of impairment; because there was not a finding of impairment, the Order required the approval of these applications. . . . Given [the chief engineer's] statutory duty to protect prior appropriation rights,

the Division remains fundamentally concerned that water diverted pursuant to this application may impair prior rights in the event of water shortage."

The KWAA grants the Secretary of Agriculture the authority to review the chief engineer's orders or the chief engineer's failure to act upon water appropriation applications. K.S.A. 2012 Supp. 82a-1901. The record suggests that the Secretary mandated approval of Clawson's applications due to the undisputed fact that no finding had been made that the approval of those applications would impair prior water rights even after the applications had been under review for years. While the chief engineer may be rightfully concerned that Clawson's use will impair existing water users, the KWAA does not give the chief engineer carte blanche authority to alter water appropriations. For example, the chief engineer may only suspend use under a water right for the failure to comply with the KWAA under K.S.A. 2012 Supp. 82a-770; but the chief engineer cannot alter a water right permanently, except in cases of abandonment under K.S.A. 2012 Supp. 82a-718 or when a water user submits a change-of-use application under K.S.A. 2012 Supp. 82a-708b.

In sum, the KWAA does not authorize the chief engineer to reevaluate and reconsider an approval once a permit has been issued. Clawson would have to invest significant amounts of money to reperfect the existing water rights. If the chief engineer could reduce the rate of diversion and the quantity of the water rights authorized to be perfected, the permit would be meaningless. We affirm the district court's rejection of the chief engineer's retention of jurisdiction.

## DOES THE CHIEF ENGINEER HAVE AUTHORITY TO INCLUDE A MONITORING PLAN WHEN APPROVING AND ISSUING WATER APPROPRIATION PERMITS?

In her cross-appeal, Clawson argues that the chief engineer disregarded the Secretary's order by imposing a "draconian monitoring plan that is nothing less than an end-run around the Secretary's Order and an effective denial of the Permit." Clawson recognizes that the chief engineer has statutory authority to impose a monitoring plan but contends "no reasonable person would incur ap-

proximately $2,000,000 to drill and equip ten irrigation wells and the other requirements of the Monitoring Plan when the Chief Engineer has made it clear that he intends to shut the wells down and revoke the Permits." Clawson essentially argues that the chief engineer acted beyond his jurisdiction, misinterpreted or misapplied the law, and acted otherwise arbitrarily and unreasonably when he imposed the monitoring plan.

In response, the DWR argues that this court does not need to address the validity of the monitoring plan because the district court upheld the monitoring plan. The DWR contends that this "court must accept all evidence and inferences that support or tend to support the findings of the trial court as true and must disregard all conflicting evidence."

*The Monitoring Plan Is Within the Chief Engineer's Statutory Authority.*

As previously stated, a court reviewing an administrative action may grant relief if it determines that the agency violated one or more of the provisions listed in K.S.A. 2012 Supp. 77-621(c)(1)-(8). As Kansas administrative agencies have no common-law powers, "any authority claimed by an agency or board must be conferred in the authorizing statutes either expressly or by clear implication from the express powers granted." *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, 455, 228 P.3d 403 (2010).

The chief engineer imposed a monitoring plan that required Clawson to equip each of the flowmeters with an

"electronic rate logger whose data can be downloaded by the Kansas Department of Agriculture to monitor and log the pumping rate and time of use of the well. Each water meter with electronic rate logger shall be set to record the pumping rate in gallons per minute every 30 minutes on the hour and half hour throughout each irrigation season."

Upon review, the district court found that while the statute "does not mention electronic log recorders nor monitoring wells . . . , a plain reading of the statute would appear to allow these items. A monitoring well(s) [*sic*] is a type of measuring device to determine

water levels. Electronic log readers are merely devices that make reading a meter or gauge easier."

This dispute involves interpretation of K.S.A. 82a-706c, which governs meters, gages, and other measuring devices:

"The chief engineer shall have *full authority* to require any water user to install meters, gages, or other measuring devices, which devices he or she or his or her agents may read at any time, and to require any water user to report the reading of such meters, gages, or other measuring devices at reasonable intervals. He or she shall have full authority to make, and to require any water user to make, periodic water waste and water quality checks and to require the user making such checks to report the findings thereof." (Emphasis added.)

The KWAA does not define "full authority." Examining the definition of each word individually, "full" is defined as "lacking restraint or check" and "completely occupied." Webster's Third New International Dictionary 919 (1993). "Authority" is defined as "a citation (as from a book) used in defense or support of one's actions, opinions, or beliefs" and "delegated power over others." Webster's Third New International Dictionary 146 (1993). When read together, the chief engineer has broad power "to require any water user to install meters, gages, or other measuring devices." K.S.A. 82a-706c. Although K.S.A. 82a-706c does not mention electronic rate loggers, given the chief engineer's power to require measuring devices, the statute implicitly authorizes electronic rate loggers, which are measuring devices. We agree with the district court that the chief engineer acted within his statutory authority by imposing a monitoring plan, which included electronic rate loggers, on Clawson's permits.

*The Record Is Insufficient to Determine Whether the Chief Engineer's Monitoring Plan Is Unreasonable.*

Clawson does not only challenge the chief engineer's legal authority to impose the monitoring plan but also challenges its burdensome nature and claims the monitoring plan effectively eviscerates the ability to appropriate water for beneficial use as provided by the permits. Clawson claims the monitoring plan is "draconian" and "an effective denial of the Permit." Moreover, Clawson claims "no reasonable person would incur approximately

$2,000,000 to drill and equip ten irrigation wells and the other requirements of the Monitoring Plan when the Chief Engineer has made it clear that he intends to shut the wells down and revoke the Permits." Unfortunately, the district court's order glosses over this objection.

Clawson's objection to the burdensome nature of the monitoring plan is grounded in K.S.A. 2012 Supp. 77-621(c)(8), which invalidates an agency action which is "otherwise unreasonable, arbitrary, or capricious." Our Supreme Court has held that "an action is unreasonable when it is taken without regard to the benefit or harm to all interested parties or is without foundation in fact, and that an action is arbitrary and capricious if it is unreasonable or lacks any factual basis." *Wheatland*, 46 Kan. App. 2d at 757 (citing *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, 431, 885 P.2d 1233 [1994]).

Because of the unusual way the water appropriation permits were granted, there was no record developed as to the reasonableness of the chief engineer's monitoring plan. The Secretary simply ordered that the applications be approved under conditions set by the chief engineer. The chief engineer approved the applications, with some modifications to the amount of water to be appropriated, then added the extensive monitoring requirements to which Clawson now objects. Clawson objected to the Secretary, who simply approved the chief engineer's order. The district court on appeal only addressed the legal ability of the chief engineer to impose such monitoring—the legal authority we have just addressed above—but did not examine whether the monitoring plan was reasonable under the facts of the present case. If there is a sufficient factual basis for Clawson's claim that the monitoring plan imposed by the chief engineer is "draconian" and amounts to an "effective denial of the Permit," then such a monitoring plan may be unreasonable.

Since Clawson has the burden to show the chief engineer's monitoring plan is unreasonable, Clawson should be given the opportunity to present evidence on this point. As this has not happened, we must remand this sole question back to the district court with instructions that it remand the matter to the DWR for an eviden-

tiary hearing to determine the reasonableness of the chief engineer's monitoring plan in light of our opinion.

The district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.