No. 111,975

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GARETSON BROTHERS and FORELAND REAL ESTATE, LLC,
*Appellees*,

v.

AMERICAN WARRIOR, INC., Successor in Interest to KELLY and DIANA UNRUH,
*Appellant*.

and

RICK KOEHN,
*Appellee*.

SYLLABUS BY THE COURT

1.


The Kansas Water Appropriation Act (KWAA), K.S.A. 82a-701 *et seq.*, dedicates all water in Kansas to the use of the people of the state, subject to the control and regulation of the state in the manner prescribed in the Act. K.S.A. 82a-702.


2.


K.S.A. 82a-703 authorizes the appropriation of water, subject to senior, vested, or prior appropriation rights to divert water from the same source.

3.

The holders of appropriation rights do not own the groundwater—they simply have a right to divert it for a beneficial use—including irrigation. K.S.A. 82a-707(a) and K.A.R. 5-1-1(o).

4.

A water right in which a person is lawfully authorized to divert and use water is deemed to be a real property right that passes as an appurtenance with a conveyance of the land. K.S.A. 82a-701(g).

5.

K.S.A. 82a-706 grants the chief engineer of the Kansas Department of Agriculture's Division of Water Resources (DWR) the authority to enforce and administer the laws of this state pertaining to the beneficial use of water, and the chief engineer shall control, conserve, regulate, allot, and aid in the distribution of water resources in accordance with the rights of priority of appropriation.

6.

K.S.A. 2014 Supp. 82a-707(c) provides that the first person to divert water from any source and use it for beneficial purposes has prior right thereto. In other words, "the first in time is first in right."

7.

K.S.A. 82a-716 and K.S.A. 82a-717a afford a senior water right holder the right to seek injunctive relief—and in some cases monetary damages—in order to protect his or her prior right against a junior water right holder.

8.

If the State is not a party to a legal action, the district court has the authority under K.S.A. 82a-725 to order DWR or its chief engineer to serve "as referee, for investigation of and report upon any or all of the physical facts involved and the division or its chief engineer shall thereupon make such an investigation and report as ordered by the court."

9.

K.S.A. 82a-725 further requires that a district court shall review the DWR's report—as well as any objections properly filed by the parties—and that the report shall serve as evidence of the physical facts.

10.

It is appropriate for a district court to consider a report filed by DWR under K.S.A. 82a-725 as evidence at a temporary injunction hearing without first requiring the chief engineer or another witness to testify about the report so long as the district court also allows the parties to present evidence in an attempt to rebut the report.

3

11.

It is not the role of an appellate court to reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence presented at a temporary injunction hearing.

12.

Looking to the plain and unambiguous language of K.S.A. 82a-716 and K.S.A. 82a-717a, it is apparent that the legislature intended that the holder of a senior water right may seek injunctive relief to protect against a diversion of water by a holder of a junior water right when that diversion does or would diminish, weaken, or injure the prior right.

13.

The purpose of a temporary injunction is not to determine any disputed right but to prevent injury to a claimed right pending a final determination of the controversy on its merits. In other words, a temporary injunction merely preserves the status quo until a final determination of a controversy can be made.

14.

In the context of a temporary injunction, the status quo is the last actual, peaceable, noncontested position of the parties that preceded the pending controversy.

Appeal from Haskell District Court; LINDA P. GILMORE, judge. Opinion filed April 3, 2015. Affirmed.

4

*Gerald O. Schultz* and *Zachary D. Schultz*, of Schultz Law Office, of Garden City, for appellant American Warrior, Inc.

*Lynn D. Preheim*, *J. Michael Kennalley,* and *Jordan E. Kiefer*, of Stinson Leonard Street LLP, of Wichita, for appellees Garetson Brothers and Foreland Land Real Estate, LLC.

*Rick Koehn*, appellee pro se.

Before BRUNS, P.J., BUSER and POWELL, JJ.

BRUNS, J.:  This is an interlocutory appeal arising out of a water appropriations action in Haskell County. Specifically, this action involves the priority of water rights between a senior right holder and a junior right holder to use water from the Ogallala Aquifer. The district court granted a temporary injunction in favor of the senior right holder and ordered the junior right holder to refrain from pumping water from two wells located on the junior right holder's land during the pendency of this action. On appeal, the junior right holder seeks to vacate the temporary injunction. Because we conclude that the district court did not abuse its discretion, we affirm the district court's decision to grant a temporary injunction.

FACTS

*Historical Background*

On March 14, 2005, Garetson Brothers, a Kansas general partnership, filed a complaint with the Kansas Department of Agriculture's Division of Water Resources (DWR) alleging that two junior water rights located on neighboring land had impaired its senior water right. At that time, Garetson Brothers owned a tract of land in Haskell County upon which a single well—used for crop irrigation—is located. A prior owner of

Garetson Brothers' land had filed for and received a vested water right in the well on September 12, 1950. This vested right is numbered HS-003.

The first neighboring well at issue in this action was approved in 1964 and was given an appropriation water right numbered 10,467. The second neighboring well was approved in 1976 and was given an appropriation water right numbered 25,275. Both of these wells are also used for the irrigation of crops. All of the wells are located in Groundwater Management District 3 in Southwest Kansas, overlying the Ogallala Aquifer. The Ogallala Aquifer is part of the High Plains Aquifer System spanning eight Midwestern states.

DWR immediately began investigating the complaint by installing water level monitoring equipment and gathering data to help determine the degree of well-to-well impairment—if any—occurring between the water rights at issue. In addition, DWR began investigating three other neighboring wells that pulled water from the same source. In 2007, however, Garetson Brothers withdrew the complaint. In their letter withdrawing the complaint, Garetson Brothers wrote:

> "During the nearly two years since we filed for relief, our goal has been to bring attention to the urgent state of decline of the Ogallala Aquifer in [Southwest Kansas]. Rather than being a positive catalyst for change in the effort to extend the useful life of the aquifer as a whole we have been perceived as selfishly damaging our neighbors for our own gain."

Despite the withdrawal of the complaint, DWR continued to monitor these wells and record data.

*Filing of Present Action*

On May 1, 2012, Garetson Brothers filed a petition in Haskell County District Court, alleging impairment of its senior water right by Kelly and Diana Unruh—who owned water rights 10,467 and 25,275 at that time. The Unruhs filed an answer on June 11, 2012, in which they admitted to owning the two junior water rights but denied the allegations of impairment. In addition, the Unruhs asserted a counterclaim against Garetson Brothers, claiming that the senior water right had been lost when the well on the Garetson Brothers' land had been redrilled, allegedly changing the water's point of diversion. The Unruhs also alleged that the new well was impairing their junior water rights.

On January 31, 2013, the district court appointed DWR as the referee for fact investigation and report pursuant to K.S.A. 82a-725. In a preliminary report filed with the district court on April 3, 2013, DWR concluded that the Garetson Brothers' senior water right "has been substantially impaired by operation of [Junior] Water Rights 10,467 and 25,275[,]" as well as by other neighboring water rights. The preliminary report stated, however, that more testing and data were needed to determine the extent of the impairment.

*First Temporary Injunction*

After receiving DWR's preliminary report, the Garetson Brothers filed a motion for temporary injunction. On the morning of May 16, 2013, prior to the commencement of an evidentiary hearing on the motion, counsel for the Unruhs disclosed for the first time that his clients had sold the land and the water rights to American Warrior, Inc. (AWI), a gas compressor packager. Because AWI had previously been represented by District Judge Bradley E. Ambrosier when he was in private practice, he stepped down from the case and the hearing was continued.

Ultimately, District Judge Clinton B. Peterson heard the motion for temporary injunction on May 20, 2013. During the hearing, it was disclosed that the property and junior water rights had been sold to AWI on May 30, 2012, which was before the Unruhs filed their answer in this case. Upon learning that the sale had not been disclosed for nearly a year while the lawsuit continued to move forward, the district judge appropriately noted her concern over "the Defendants' and their attorney's lack of candor, both to the plaintiff and the Court, regarding the true owner of this property."

The day after the evidentiary hearing, the district court granted the Garetson Brothers' motion for temporary injunction. In doing so, the district court applied the principle of "first in time, first in right" and found that AWI's junior water rights were substantially impairing the Garetson Brothers' senior water right. Accordingly, the district court ordered "the defendants, their successors, their tenants, and their agents . . . to refrain from pumping Well 10,467 and Well 25,257 for the pendency of this matter or until ordered otherwise by this Court." Furthermore, the district court ordered that Cecil O'Brate—the owner and chief executive officer of AWI—be joined as a defendant.

On August 5, 2013, Garetson Brothers filed an amended petition adding AWI and Rick Koehn—the tenant farming on AWI's land—as defendants. Subsequently, the district court dismissed O'Brate as a party. Moreover, on October 14, 2013, Garetson Brothers transferred its senior water right to Foreland Real Estate, LLC (FRE), and FRE subsequently joined the lawsuit as a named plaintiff under K.S.A. 2014 Supp. 60-221.

In an order entered on December 2, 2013, District Judge Linda P. Gilmore vacated the initial temporary injunction because Koehn had not been joined as a party at the time it was entered. In addition, the district court directed DWR to "continue to investigate and report upon any or all of the physical facts concerning the water rights referenced in this case" pursuant to the procedure set forth in K.S.A. 82a-725. Specifically, the district court ordered:

"The report shall set forth findings of fact in regard to the degree HS-003 is being impaired by water rights 10,467 and 25,257. The report shall set forth the opinions of DWR regarding whether any such impairment . . . [is] a substantial impairment to HS-003. If DWR concludes substantial impairment to HS-003 exists, DWR shall advise as to recommended remedies to curtail [the] substantial impairment to HS-003 and explain why these remedies are recommended."

*DWR's Final Report*

Prior to the filing of the final report with the district court, the parties received a copy of the report from DWR and were given the opportunity to file objections. Both FRE and AWI filed objections with DWR as well as exceptions with the district court as permitted by K.S.A. 82a-725. Although it does not appear that Koehn filed an objection with DWR, he did file exceptions with the district court that generally followed those asserted by AWI.

DWR filed its final report with the district court on March 31, 2014. In the 30-page report—including an executive summary and attachments—DWR sets forth its findings, conclusions, and potential remedies. The final report notes that for several decades there has been a substantial decline in groundwater in the area of Southwest Kansas where the land owned by FRE and AWI is located. In fact, the average annual rate of water extraction is 1,200 to 1,500 acre-feet per year while the average rate of water recharge is less than 100 acre-feet per year. As a result, scientists from the Kansas Geological Survey have concluded that "if recent practices continue, well operators in the area are facing the imminent end of the productive life of the isolated compartment of [the Ogallala] aquifer that they share."

According to the final report, DWR examined six water rights: FRE's senior water right, AWI's two junior water rights, and three other neighboring junior water rights. The final report notes that a seventh junior water right—number 8,157—uses water from two

9

wells: the well authorized under HS-003, and another well 1 mile away. However, DWR found that it is unlikely that this junior water right affects FRE's well because it appears to be pumping water from a different compartment of the Ogallala Aquifer.

Although FRE's senior water right—HS-003—is authorized to pump up to 240 acre-feet of water at a rate of 600 gallons per minute for the irrigation of crops, DWR's testing revealed that the well's maximum sustained rate of pumping under current conditions is only 404 gallons per minute. DWR also found that "only one other well can be allowed to irrigate crops concurrently with File No. HS 003, and then only under a strict time and rate schedule that may prove impractical to implement." Accordingly, DWR concluded that FRE's senior water right "has been substantially impaired by operation of AWI's Water rights 10,467 and 25,275" and other neighboring water rights.

DWR also concluded that when all six water rights are being operated, AWI's two junior water rights account for approximately half of the impact on FRE's senior water right. Further, DWR concluded that the impact of AWI's junior water rights on FRE's senior water right is more immediate because of the close proximity of AWI's wells to FRE's well. In addition, DWR determined that if FRE's senior water right is to be protected, the pumping of water by AWI and the other junior water right holders must be significantly curtailed.

Finally, DWR suggested two possible remedies to ensure FRE's ability to pump 240 acre-feet of water at a rate of 404 gallons per minute. First, DWR suggested that FRE's senior water right could be protected if only one of the other neighboring junior water right holders—to be determined on the basis of seniority or by distance from FRE's well—is allowed to continue pumping water on a restricted basis. Second, DWR suggested that FRE's senior water right could be protected "by curtailing all of the Other Neighborhood Water Rights."

*Second Temporary Injunction*

Following the completion of DWR's final report, FRE filed a second motion for temporary injunction with the district court, and the district court held an evidentiary hearing on April 30, 2014. At the beginning of the hearing, FRE moved for the admission of DWR's final report into evidence. In response, AWI and Koehn objected to its admission because the report was subject to numerous pending objections filed by the parties and based on an alleged lack of foundation. After considering the objections, the district court admitted the final report into evidence for the purposes of the temporary injunction hearing pursuant to K.S.A. 82a-725. The district court noted, however, that AWI and Koehn would have the opportunity to present evidence to rebut points set forth in the report.

A review of the 273-page transcript from the temporary injunction hearing reveals that the parties presented the testimony of six witnesses and admitted numerous exhibits into evidence. The witnesses included Jay and Jarvis Garetson; Mike Meyer, who is the water commissioner stationed at DWR's Garden City office; Rick Koehn; Mark Rude, who is a geologist and executive director of Southwest Kansas Groundwater Management District No. 3; and Kenneth Rainwater, Ph.D., who is a civil engineering professor and AWI's expert. We will briefly summarize the evidence presented at the hearing.

Jay and Jarvis Garetson testified that FRE's ability to use water as authorized under its senior water right has been depleted, which has had a negative impact on its crops. In addition, the Garetsons testified that HS-003 was able to pump water at a rate of 802 gallons per minute in 2002, but by 2006 it could only pump at a rate of 350 gallons per minute. The Garetsons also testified that the best feature of FRE's land was its senior water right, and they suggested that failing to protect its seniority would devastate the land's value.

11

During his testimony, Rude discussed the role of Ground Water Management District No. 3. He noted the significant decline of the Ogallala Aquifer over the years as well as the lowering of the water table in Haskell County. Rude also discussed the history of HS-003 as a vested water right that has a priority established prior to the enactment of the KWAA. But he had not performed a study on HS-003 so he could not give specifics about its use. In addition, he clarified that a water right is not a well itself but is a "rate, quantity, point of diversion, place of use, use made of water, and priority."

AWI's expert, Dr. Rainwater, testified that he did not believe that the district court should rely on the math in DWR's final report to decide how much a particular water right should be allowed to pump. Dr. Rainwater opined that the equation DWR used was based on an assumption about a hypothetical aquifer that did not work for the complex alluvial aquifer situations found in the High Plains Aquifer system. He did not, however, challenge DWR's factual data. Dr. Rainwater testified that HS-003 experiences a significant drawdown even when no other wells are pumping, and he noted that all wells create their own drawdown when turned on.

According to Dr. Rainwater, the well on FRE's land was placed at a bad site, and he suggested that the screen on the new well limited its ability to pull in water because it is much smaller than the screens on neighboring wells. Although he felt that moving HS-003's well could give FRE access to more water, he conceded that the well is legally allowed to be where it is located. Dr. Rainwater predicted that, even if all neighboring wells were shut off for the summer of 2014, HS-003 would still struggle as it had in recent summers. Ultimately, Dr. Rainwater rendered the opinion that HS-003 is not unreasonably impaired.

On May 5, 2014, the district court issued its decision to grant a temporary injunction in favor of FRE. Specifically, the district court concluded that FRE "is likely to succeed on the merits of [its] claim, which is, essentially [its] senior water right is

12

being impaired by an appropriator with a later priority of right." Relying on the Black's Law Dictionary definition, the district court found: "Impair means to weaken, to make worse, to lessen in power, diminish, or relax or otherwise affect in an injurious manner." See Black's Law Dictionary 752 (6th ed. 1990).

The district court further found that FRE would suffer irreparable harm if its "first in time water right is being depleted year after year as a result of ongoing impairment"; that "the threatened injury to [FRE] outweighs the alleged damage to [AWI] as [FRE's] first in time water right continues to be depleted at a rate that would take years to recharge"; that "knowledge that first in time water rights will have precedent fosters certainty and allows remedies that hopefully will slow down the depletion of the aquifer"; and that the law does not provide an adequate remedy because the impairment "is continuous and . . . is of such character [that FRE] cannot be compensated by any ordinary standard of value or damages." Accordingly, the district court ordered AWI and its tenant not to pump water from its wells during the pendency of this action.

Following the issuance of the injunction, AWI moved the district court for more specific findings concerning the injunction's terms. AWI also asked the district court to stay the injunction pending appeal. Subsequently, the district court clarified that the parties were not to pump water from the wells located on AWI's property once FRE posted a bond. Moreover, the district court set the amount of the bond at $299,438 and denied the motion to stay. On May 30, 2014, FRE filed the bond, thereby triggering the temporary injunction.

ANALYSIS

*Issues Presented and Standard of Review*

The ultimate issue in this interlocutory appeal is whether the district court abused its discretion in issuing a temporary injunction. In addition, there are several preliminary issues that we will address before we reach the ultimate issue. The first two preliminary issues involve evidentiary matters—the admission of DWR's final report into evidence and the consideration given to certain evidence presented by AWI. The third preliminary issue we will address is whether the district court erred in interpreting the language of K.S.A. 82a-717a.

*Kansas Water Appropriations Act, K.S.A. 82a-701 et seq.*

Until the late 1800s, Kansas followed common-law rules relating to water rights. As early as 1886, however, the Kansas Legislature began to shift to the appropriation doctrine. See L. 1886, ch. 115, sec. 1. "'The appropriation doctrine is based upon the premise that all unused water belongs to all of the people of the state. The first person to divert water from any source and use it for beneficial purposes has prior right thereto. In other words, *first in time, first in right*.'" (Emphasis added.) *Clawson v. Kansas Dept. of Agriculture*, 49 Kan. App. 2d 789, 797, 315 P.3d 896 (2013) (quoting *F. Arthur Stone & Sons v. Gibson*, 230 Kan. 224, 228, 630 P.2d 1164 [1981]).

In 1945, the legislature enacted the Kansas Water Appropriation Act (KWAA), K.S.A. 82a-701 *et seq*. See G.S. 1935 (1945 Supp.), 82a-701 et seq.; L. 1945, ch. 390; Peck, *Groundwater Management in Kansas:  A Brief History and Assessment*, 15 Kan. J.L. & Pub. Pol'y (No. 3), 441, 442-43 (Spring 2006). The KWAA dedicates all water in Kansas "to the use of the people of the state, subject to the control and regulation of the state" in the manner set forth in the Act. K.S.A. 82a-702. Moreover, the KWAA authorizes the appropriation of the water for beneficial use, subject to vested rights.

14

K.S.A. 82a-703. Although "beneficial use" is not defined in the KWAA, K.A.R. 5-1-1(o) lists various beneficial uses of water—including irrigation.

Under the KWAA, there are two types of water rights. K.S.A. 2014 Supp. 82a-701(d) defines a "vested right" as "the right of a person under a common law or statutory claim to continue the use of water having actually been applied to any beneficial use" prior to the enactment of the KWAA. Those claiming a vested right were required to file a claim with the chief engineer of DWR prior to July 1, 1980. See K.S.A. 82a-704a(d). In the present case, FRE has a vested water right that existed prior to 1945 and was properly recorded with the chief engineer in 1950.

K.S.A. 2014 Supp. 82a-701(f) defines an "appropriation right" as "a right, acquired under the provisions of [the KWAA], to divert from a definite water supply a specific quantity of water at a specific rate of diversion, *provided such water is available in excess of the requirements of all vested rights that relate to such supply . . . .*" (Emphasis added.) Accordingly, although an appropriation right has preference over all subsequent appropriation rights, it does not have priority over senior, vested, or prior appropriation rights to divert water from the source. Except for certain domestic uses, an appropriation right must be acquired from the chief engineer of DWR under K.S.A. 82a-705. The holders of an appropriation right do not own the groundwater—they simply have a right to use it subject to the beneficial use principle. K.S.A. 2014 Supp. 82a-707(a). In the present case, AWI is the holder of two appropriation rights that were properly recorded with the chief engineer of DWR in 1964 and 1976.

A water right—whether a vested right or an appropriation right—in which a person is lawfully authorized to divert and use water is deemed to be a real property right. As such, the right "passes as an appurtenance with a conveyance of the land [it is on or in connection with which the water is used] by deed, lease, mortgage, will, or other voluntary disposal, or by inheritance." K.S.A. 2014 Supp. 82a-701(g). Here, it is

15

undisputed that FRE obtained its senior vested water right from Garetson Brothers, and AWI obtained its appropriation water rights from the Unruhs.

Kansas law expressly provides that "the first in time is first in right." K.S.A. 2014 Supp. 82a-707(c). Under the KWAA, the chief engineer of DWR assigns each appropriation right a number—the lower the number, the higher the priority. Likewise, as noted above, appropriation rights are subject to vested rights. As such, "the date of priority . . . and not the purpose of use, determines the right to divert and use water at any time when the supply is not sufficient to satisfy all water rights." K.S.A. 2014 Supp. 82a-707(b). In other words, a vested right—such as that held by FRE—has priority over an appropriation right—such as those held by AWI—and as between appropriation rights, an earlier date has priority over a later date. Accordingly, in the present case, FRE holds a senior vested water right and AWI holds two junior appropriation water rights.

K.S.A. 82a-706 grants the chief engineer of DWR the authority to enforce and administer the laws of this state pertaining to the beneficial use of water, and the chief engineer shall control, conserve, regulate, allot, and aid in the distribution of water resources in accordance with the rights of priority of appropriation. Furthermore, K.S.A 82a-706b authorizes the chief engineer of DWR to determine if there has been an unlawful diversion of water. The procedure for filing an administrative action for a determination by the chief engineer is set forth in K.A.R. 5-4-1. In the alternative, K.S.A. 82a-716 and K.S.A. 82a-717a afford a senior water right holder the right to seek injunctive relief—and in some cases monetary damages—in order to protect his or her prior right against a junior water right holder. See *Williams v. City of Wichita*, 190 Kan. 317, 335, 374 P.2d 578 (1962); see also Duncan, *High Noon on the Ogallala Aquifer: Agriculture Does Not Live by Farmland Preservation Alone*, 27 Washburn L.J. 16, 47 (1987) ("The Act gives an appropriator seeking to protect an allotment the right to enjoin a junior appropriator's interference." [Citing K.S.A. 82a-716.]); Peck and Owen, *Loss of Kansas Water Rights for Non-Use*, 43 U. Kan. L. Rev. 801, 801 (1995) ("Water rights

under the 'first in time, first in right' system are subject to temporary curtailment by a more senior right." [Citing K.S.A. 82a-717a.]).

If the State is not a party to the action, the district court has the authority under K.S.A. 82a-725 to order DWR or the chief engineer to serve "as referee, for investigation of and report upon any or all of the physical facts involved and the division or its chief engineer shall thereupon make such an investigation and report as ordered by the court." After the rights for the use of water have been judicially determined, the court must provide a certified copy of the decree to the chief engineer. K.S.A. 82a-720. In turn, DWR is required to "aid in the distribution of such water according to [the court's] decree . . . ." K.S.A. 82a-719.

*Admission of DWR's Final Report into Evidence*

On appeal, AWI contends that the district court erred in admitting DWR's final report into evidence without requiring a proper foundation. Specifically, AWI argues that the author or authors of the report should have been required to testify before it was admitted into evidence. In response, FRE contends that K.S.A. 82a-725 authorizes the admission of the final report into evidence without the need for foundation testimony.

As a general rule, all relevant evidence is admissible under K.S.A. 60-407(f); see K.S.A. 60-401(b). Here, it is undisputed that DWR's final report is relevant and material. Rather, the only question presented on appeal relates to whether there was sufficient foundation for the admission of the final report into evidence.

We apply evidentiary rules either as a matter of law or in the exercise of the district court's discretion, depending on the nature of the question. See *City of Wichita v. Denton*, 296 Kan. 244, 257, 294 P.3d 207 (2013). "[A] district court usually has considerable discretion in evidentiary rulings regarding foundation evidence, and its

17

decisions in this regard are reviewed for an abuse of discretion." *State v. Davis,* 41 Kan. App. 2d 1034, 1037, 207 P.3d 281 (2009) (citing *City of Overland Park v. Cunningham,* 253 Kan. 765, 772, 861 P.2d 1316 [1993]). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Snider v. American Family Mut. Ins. Co*., 297 Kan. 157, 169, 298 P.3d 1120 (2013).

To the extent that the issue presented involves the adequacy of the legal basis for the district court's decision to admit the final report into evidence—specifically an interpretation of K.S.A. 82a-725—our review is de novo. See *State v. Woolverton*, 284 Kan. 59, 64, 159 P.3d 985 (2007). When interpreting a statute, we must first attempt to discern the legislature's intent through the language enacted, giving common words their ordinary meanings. When statutory language is plain and unambiguous, we may not speculate as to legislative intent, and we are not to read into the statute words not readily found there. It is only when the language is unclear or ambiguous that we employ the canons of statutory construction, consult legislative history, or otherwise consider background information to ascertain the statute's meaning. *In re A.M.M.-H.,* 300 Kan. 532, 535, 331 P.3d 775 (2014).

K.S.A. 82a-725 grants the district court the authority to "order a reference to [DWR] or its chief engineer, *as referee*, for investigation of and report upon all of the physical facts involved and [DWR] or its chief engineer *shall thereupon make such an investigation and report as ordered by the court*." (Emphasis added.) Moreover, the statute requires that the report "shall set forth such *findings of fact* as may be required by the court's order of reference and may contain such *opinions upon the facts* as it deems proper in view of the issues submitted." (Emphasis added.) Prior to filing the report with the district court, the statute requires that DWR provide a copy to the parties and grants them 30 days to file objections.

18

Furthermore, K.S.A. 82a-725 goes on to state:

"After the division, or its chief engineer, has considered the objections, *it shall file its report, as referee, with the clerk of the court* and give notice by registered or certified mail of the filing of its report to the parties or their attorneys. *The court shall review the report upon exceptions thereto filed with the clerk* of the court within thirty (30) days after date of mailing registered notice of the filing of the report. Except in its discretion or for good cause shown, the court shall not consider any exception to the report unless it appears that the excepting party presented the matter of the exception to the division or its chief engineer in the form of an objection. *The report shall be evidence of the physical facts found therein, but the court shall hear such evidence as may be offered by any party to rebut the report or the evidence.* If suit is brought in a federal court for determination of rights to water within, or partially within, the state, the division or its chief engineer may accept a reference of such suit as master or referee for the court." (Emphasis added.)

Based on our review of the record, it appears that the district court and the DWR appropriately followed the procedure set forth in K.S.A. 82a-725. Moreover, AWI does not challenge the procedure in its brief. Rather, AWI argues that the district court erred by failing to require the author of DWR's final report to testify prior to it being admitted at the temporary injunction hearing.

The unambiguous language of K.S.A. 82a-725, however, expressly requires that "[t]he court *shall review* the report"—as well as any objections properly filed by the parties—and that "[t]he report *shall be evidence* of the physical facts . . . ." (Emphasis added.) On its face, the statute does not require the chief engineer or any other witness to testify prior to the district court reviewing the report or considering it as evidence, so we will not read such language into the statute. Thus, we find that it was appropriate for the district court to consider DWR's final report as evidence at the temporary injunction hearing without first requiring the report's author to testify so long as it allowed the parties to present evidence in an attempt to rebut the report—which it did.

19

In addition, we find that allowing the district court to consider DWR's final report without first requiring testimony from the chief engineer or other witnesses to testify as to foundation is consistent with the KWAA when viewed in its entirety. In adopting the KWAA, the legislature (1) set forth specific administrative and court procedures that may be utilized to resolve disputes between the holders of water rights; (2) recognized the unique expertise of DWR or its chief engineer in the field of water appropriation; (3) required DWR to consider the parties' objections before filing its final report with the court; (4) ensured that a neutral party—DWR or its chief engineer—is available to assist the court in investigating the facts and to render opinions on such facts in cases involving disputes over water rights; and (5) protected the parties by requiring the district court to review the report upon any timely filed exceptions and by allowing the parties to present additional evidence in an attempt to rebut the report.

Even if we look to Chapter 60 for guidance in resolving this issue as AWI suggests that we do, the result would be the same. K.S.A. 60-402 recognizes that there are other statutory provisions that may control in specific situations rather than the standard rules of evidence. See 4 Gard, Casad, and Mulligan, Kansas Law and Practice, Kan. C. Civ. Proc. Annot. § 60-402, Commentary, p. 453 (5th ed. 2012) ("When specific questions arise resort should be had to the statutes to discover the existence of such applicable provisions."). Here, we find guidance from K.S.A. 2014 Supp. 60-253, which addresses references to special masters.

It is undisputed that DWR or its chief engineer was appointed by the district court in this case to serve as a "referee" pursuant to K.S.A. 82-725. Under Chapter 60, the term referee is used interchangeably with the term master. See K.S.A. 2014 Supp. 60-253(a)(2) ("'master' includes a referee, an auditor, a commissioner and an examiner"). Hence, as explained in 4 Gard, Casad, and Mulligan, Kansas Law and Practice, Kan. C. Civ. Proc. Annot. § 60-253, Commentary, p. 312:

20

"The master now takes the place of the referee, the commissioner, the auditor and the examiner, except where those designations are retained by the provisions of other statutes. This rule should make the procedure on the state level as uniform as it is possible to make it in view of the many separate procedures for trial examiners and the like in specialty fields."

Moreover, K.S.A. 2014 Supp. 60-253(e)(2) provides that in nonjury actions "the court must accept the master's findings of fact unless clearly erroneous." Similar to K.S.A. 82a-725, there is no requirement that the master testify before the referring court reviews the master's report. Rather, after considering any timely objections asserted by the parties, the district court may "adopt or modify the report, reject the report in whole or in part, receive further evidence or recommit the report with instructions." K.S.A. 2014 Supp. 60-253(e)(2).

Consequently, we conclude that the district court did not commit an error of law in admitting or considering DWR's final report at the temporary injunction hearing without first requiring the chief engineer or another witness to establish a foundation. Furthermore, we do not find the district court's decision to be arbitrary, fanciful, or unreasonable.

*Weight Given to AWI's Evidence*

AWI also contends that the district court erred in ignoring undisputed or uncontroverted evidence presented at the temporary injunction hearing. Specifically, AWI argues that the district court disregarded testimony from its expert, Dr. Rainwater, that the methodology used in DWR's final report was "not . . . based on scientifically acceptable procedures." In addition, AWI argues that the district court disregarded Dr. Rainwater's testimony that "[p]art of the reason [FRE's] well performs poorly is because of the amount of screen that was used in construction of the well." The screen is the subterranean portion of the well that actually allows groundwater to enter the well

21

during pumping. A screen with a smaller intake area will pull in less water than a screen with a larger intake area, resulting in a lower pump rate. In response, FRE contends that the district court did not ignore Dr. Rainwater's testimony but simply did not find it to be persuasive.

Contrary to AWI's assertion, Dr. Rainwater's testimony was not undisputed at the temporary injunction hearing. In fact, Dr. Rainwater's testimony was presented in an attempt to rebut the findings and opinions set forth in DWR's final report. Moreover, although Dr. Rainwater took issue with the formula used by DWR in one of its calculations, the formula was not the sole factor considered by DWR before it concluded that FRE's senior water right is being substantially impaired by the operation of AWI's junior water rights. Further, Dr. Rainwater did not dispute other portions of DWR's report regarding the impairment of FRE's senior water right. Similarly, Dr. Rainwater's opinion that FRE's well production was limited due to its construction is disputed by DWR's final report that states the impairment is principally caused by well-to-well interference.

The district court did not ignore undisputed evidence. Instead, the district court weighed the conflicting evidence—which included DWR's final report—and made factual findings. Based on our review of the record, we conclude that these findings are supported by substantial evidence. Moreover, it is not our role on appeal to reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. See *State v. Reed*, 300 Kan. 494, 499, 332 P.3d 172 (2014).

*Interpretation of K.S.A. 82a-716 and K.S.A. 82a-717a*

Additionally, AWI contends that the district court erred in its interpretation of the term "impair" as it is used in K.S.A. 82a-717a, which states in part:

22

"[A]ny common-law claimant with a vested right, or other person with . . . a prior appropriation right . . . may *restrain or enjoin . . . any diversion or proposed diversion that impairs or would impair such right* in the event that any such diversion . . . is made or threatened by any . . . other person who does not have . . . a prior appropriation right . . . ." (Emphasis added.)

Specifically, AWI would have us interpret K.S.A. 82a-717a to mean that some impairment of a senior or vested water right by diversion is acceptable, so long as it is not "beyond a reasonable economic limit"—a phrase found in K.S.A. 2014 Supp. 82a-711(c). In response, FRE contends that it was appropriate for the district court to use the definition of the word "impair" found in Black's Law Dictionary. Also, FRE asserts that K.S.A. 2014 Supp. 82a-711 does not apply to the circumstances presented in this case.

We must first attempt to discern the legislature's intent through the language used in the statutes by giving common words their ordinary meanings. As a general rule, we employ the canons of statutory construction only when the language is ambiguous. When statutory language is plain and unambiguous, we are not to speculate as to legislative intent. Likewise, we are not to read into the statutes words not readily found there. *In re A.M.M.-H.*, 300 Kan. at 535.

Both K.S.A. 82a-716 and K.S.A. 82a-717a afford prior senior water right holders the right to seek injunctive relief against a junior water right holder who is diverting water from the same source. See *Williams*, 190 Kan. at 335. But AWI does not even mention K.S.A. 82a-716 in its brief. This is significant for several reasons. First, the district court relied upon K.S.A. 82a-716—not K.S.A. 82a-717a—in granting the temporary injunction in this case. Second, the word "impair" is not used in K.S.A. 82a-716. Third, like K.S.A. 82a-717a, the phrase "beyond a reasonable economic limit" is not found in K.S.A. 82a-716.

23

In its decision granting the temporary injunction, the district court expressly found that K.S.A. 82a-716 "clearly provides authority for [FRE] to request a temporary injunction to protect [its] first in time water right." AWI's failure to brief the court on this statute or otherwise argue that the district court inappropriately applied the statute here arguably results in AWI's abandonment of this issue, meaning it is not properly before us. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Nonetheless, K.S.A. 82a-716 provides—in part—that a senior water right holder "shall have the right to injunctive relief to protect his or her prior right of beneficial use as against use by an appropriator with a later priority of right." We do not find this language to be either unclear or ambiguous.

Even if the district court had relied upon K.S.A. 82a-717a in granting the temporary injunction in this case, we do not find the word "impair" to be unclear or ambiguous. The common definition of the word "impair" is "to cause to diminish, as in strength, value, or quality." The American Heritage Dictionary 878 (4th ed. 2006). This definition is similar to the definition of impair used by the district court, which looked to Black's Law Dictionary 752 (6th ed. 1990) to define "impair" to mean "to weaken, to make worse, to lessen in power, diminish, or relax or otherwise affect in an injurious manner." See *Humana Inc. v. Forsyth*, 525 U.S. 299, 309-10, 119 S. Ct. 710, 142 L. Ed. 2d 753 (1999). Thus, using the ordinary definition of impair, we conclude that the legislature intended that the holder of a senior water right may seek injunctive relief to protect against a diversion of water by a holder of a junior water right when that diversion diminishes, weakens, or injures the prior right.

Because K.S.A. 82a-717a is clear and unambiguous, we decline AWI's invitation to add the "beyond a reasonable economic limit" language used in K.S.A. 2014 Supp. 82a-711(c). Had the legislature desired to give the word "impair" a special definition, it could have done so either by adding the definition to the text of K.S.A. 82a-717a or including it in the definition section of the KWAA located in K.S.A. 2014 Supp. 82-701.

24

However, it chose not to do so. Thus, we decline AWI's invitation to read additional language into the statute.

*Granting of Temporary Injunction*

We now turn to the ultimate issue presented: whether the district court erred in issuing a temporary injunction in this case. The purpose of a temporary injunction is not to determine any disputed right but to prevent injury to a claimed right pending a final determination of the controversy on its merits. See *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 492, 173 P.3d 642 (2007). We review the grant or denial of injunctive relief under an abuse of discretion standard. See *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012). As indicated above, judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Snider*, 297 Kan. at 169. In particular, we review the district court's findings of fact to determine if they are supported by substantial evidence and are sufficient to support its conclusions of law. See *Brown v. ConocoPhillips Pipeline Co.*, 47 Kan. App. 2d 26, 35-36, 271 P.3d 1269 (2012).

As the party challenging the order granting the temporary injunction, AWI bears the burden of proving the trial court abused its discretion. See *Steffes v. City of Lawrence*, 284 Kan. 380, 393, 160 P.3d 843 (2007). To obtain injunctive relief, including temporary injunctive relief, the requesting party must show: (1) a substantial likelihood of success on the merits; (2) a reasonable probability of irreparable future injury to the movant; (3) an action at law will not provide an adequate remedy; (4) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (5) the injunction, if issued, would not be adverse to the public interest. *Downtown Bar and Grill*, 294 Kan. at 191. It is important to recognize that AWI has not asserted that the district court erred in its findings on any of these elements.

25

AWI contends that the district court erred by finding that a temporary injunction would preserve the status quo. In particular, AWI argues that at the time the injunction was granted, the status quo allowed it to use its junior water rights for agricultural irrigation pursuant to an appropriation right granted by DWR. FRE counters that "if a first in time water right is impaired, to maintain the status quo, one would protect the first in time right." AWI also asserts that the district court erred when it issued the temporary injunction because the injunction would not cure the impairment to FRE's senior water right. In response, FRE contends that K.S.A. 82a-717a gives it the right to enjoin the holder of a junior water right from impairing its senior water right regardless of whether it would completely cure the impairment.

In *Steffes*, 284 Kan. at 394, the Kansas Supreme Court found as follows:

"'The purpose of a temporary or preliminary injunction is not to determine any controverted right, but to prevent injury to a claimed right *pending a final determination of the controversy on its merits.* The grant of a temporary injunction would not be proper if it would appear to accomplish the whole object of the suit without bringing the cause or claim to trial. A temporary injunction merely preserves the status quo *until a final determination of a controversy can be made.*' [Citation omitted.]"

We note that preservation of the status quo is not one of the five required showings before the district court can issue a temporary injunction. Further, the status quo is defined under Kansas caselaw as "the last actual, peaceable, noncontested position of the parties which preceded the pending controversy." *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 227, 689 P.2d 860 (1984). Here, the district court found that the status quo could best be served by preservation of FRE's first in time senior water right over AWI's junior water rights.

A review of the record reveals that the district court's finding regarding the status quo is supported by substantial evidence. In particular, the record demonstrates that the

26

last time the parties were in a peaceable, noncontested position was prior to 2005 when water was not being diverted from the senior water right holder by the junior water right holders. Not only was this conclusion supported by the evidence presented at the temporary injunction hearing, it is also consistent with the KWAA's policy of "the first in time is first in right" under K.S.A. 2014 Supp. 82a-707(c).

We also find AWI's argument that the temporary injunction will not cure the impairment to FRE's senior water right as beyond the scope of a temporary injunction. As noted above, a temporary injunction is not intended to be a final remedy. In fact, a temporary injunction would not be appropriate if it completely resolved the object of the lawsuit prior to trial. The temporary injunction issued by the district court is aimed at preventing FRE's senior water right from being impaired or injured further pending the final determination of this case on the merits.

CONCLUSION

In conclusion, we find temporary injunctive relief to be an appropriate remedy under the circumstances presented. We further conclude that the district court did not abuse its discretion by ordering AWI and its tenant to stop pumping water from AWI's two junior wells during the pendency of this action. We do not, of course, intend for this opinion to be a final determination on the merits, and we trust that all of the issues will be fully resolved by the district court.

Affirmed.

27